UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| ABDULLAHI HASSAN,<br><br>　　　　　　　　Plaintiff,<br>vs.<br><br>SANFORD MEDICAL CENTER,<br><br>　　　　　　　　Defendant. | 4:19-CV-4131-LLP<br><br>MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |

Pending before the Court is a Motion for Summary Judgment filed by Defendant Sanford Medical Center. (Doc. 17). For the following reasons, Sanford's Motion for Summary Judgment is granted.

## BACKGROUND

### A. Facts

Plaintiff Abdullahi Hassan ("Hassan") was employed by Sanford Medical Center from May 16, 2012, until March 19, 2018. (Doc. 19, ¶ 1). On March 19, 2018, Sanford Medical Center ("Sanford") terminated Hassan's employment. (Doc. 19, ¶ 2). At the time of his termination, Hassan was employed as a Logistics Technician within the Supply Chain Management department. (Doc. 19, ¶ 3). Hassan is a black male from Somalia. (Doc. 19, ¶ 4).

On October 24, 2017, Sanford hired Ron Wallenberg as a logistics technician within the Supply Chain Management department. (Doc. 19, ¶ 5). Wallenberg was Hassan's co-worker. (Doc. 19, ¶ 5). In February 2018, Lacy Jenkins with Sanford met with Wallenberg and Hassan regarding a negative comment that Wallenberg said about Hassan's culture and Jenkins set expectations of the two of them working together and communicating professionally and respectfully about work. (Docs. 18-2; 18-6).

On March 15, 2018, Hassan and Wallenberg engaged in a verbal argument that escalated to a physical fight on Sanford premises. (Doc. 19, ¶ 6). The fight occurred on Sanford property in the presence of two other Sanford employees. (Doc. 19, ¶ 7).

1

On the same day of the altercation, Patsy Kramer from Sanford Human Resources interviewed two employees that witnessed the fight and on March 16, 2015, Patsy Kramer interviewed Hassan and Wallenberg. (Doc. 19, ¶¶ 8, 9). Both witnesses reported that the fight started because Wallenberg was upset that Hassan offered to help with work that Wallenberg claimed he already performed. (Docs. 19, ¶ 10; 18-5). Both witnesses reported that in response to Hassan's inquiry, Wallenberg swore at Hassan and asserted that he was not a "liar." (Doc. 18-5). The verbal altercation escalated into a physical altercation between Hassan and Wallenberg. Hassan and Wallenberg provided conflicting reports as to who instigated the physical altercation, but both admitted that there was physical contact between the two. (Doc. 19, ¶ 9). In Patsy Kramer's interview notes, neither of the witnesses reported knowing who instigated the physical altercation, but both witnesses reported that Hassan and Wallenberg were "pushing and shoving" each other. (Doc. 19, ¶ 8; 18-5). One witness reported that the employees were "entangled," "grappling," and "ended up on the floor." (Doc. 19, ¶ 8). A co-worker separated Hassan and Wallenberg and told Wallenberg to "go cool down." (Doc. 18-5). Hassan then went to lunch with his two co-workers who witnessed Hassan's altercation with Wallenberg. (Doc. 18-5).

One witness reported to Human Resources that it had been stressful with Wallenberg there and that he had complained to her about almost everybody and that he takes everything "personal." (Doc. 18-5). The witness reported that Wallenberg told her that he would "kick [Hassan's] ass" and that Wallenberg "made mean comments about him (Abdul which included) their culture they don't treat their wives well, [and that] [h]e doesn't like how they talk in his (Abdul's) language." (Doc. 18-5). This witness had not previously shared these incidents with management and there is no evidence that management was otherwise aware of these comments. (Doc. 18-5).

Sanford has a Workplace Violence & Bullying Policy that prohibits any workplace violence, including physical assault and physical restraint or confinement, and further provides that "acts of violence or bullying will not be tolerated." (Doc. 19, ¶ 11). The Workplace Violence Policy defines "workplace violence" as "any act of aggression in which a person(s) seeks to hurt or intimidate another" including "physical assault, emotional or, verbal abuse or threatening, coercive or harassing behaviors." (Doc. 18-8). The Workplace Violence Policy provides that reports of employee-involved violence will be investigated by Human Resources and that this "may include corrective action up to and including termination for any employee who engages in

a violent act or bullying." (Doc. 18-8). At the time of his physical altercation with Wallenberg, Hassan was aware of Sanford's Workplace Violence Policy. (Doc. 19, ¶ 16). Prior to the physical altercation with Wallenberg, and as part of his employment at Sanford, Hassan completed Workplace Violence Prevention training on at least three occasions in 2012, 2013, and 2014. (Doc. 19, ¶ 17).

Sanford has a Disruptive Conduct or Behavior Policy that outlines the process for addressing disruptive and/or inappropriate behavior. (Doc. 19, ¶ 12). The Disruptive Conduct or Behavior Policy provides that "employees are responsible for ensuring the workplace is free of disruptive and inappropriate behavior that can negatively affect the work environment." (Doc. 18-9). The Policy provides that a complaint involving disruptive behavior by an employee will be dealt with according to the Discipline Policy," but that disruptive and inappropriate behaviors that may result in termination without prior disciplinary action include, but are not limited to: "threatening, abusive, retaliatory, or unprofessional language; degrading or demeaning comments; profanity or similarly offensive language; inappropriate physical contact with another individual that is interpreted by that individual as threatening or intimidating; an expression of intent to cause physical harm; throwing of objects." (Doc. 18-9). The Discipline Policy provides that an employee may be terminated without prior corrective action for serious misconduct, including "violent or threatening behavior toward employees." (Doc. 19, ¶ 15).

Following the investigation into the incident, Patsy Kramer sent out an email to operational leaders and human resources leaders summarizing the situation. The e-mail stated:

> Due to the fact that both engaged in this physical altercation and while they both indicated they were defending themselves they had to be separated to end it, we are requesting termination for both employees.

(Doc. 19, ¶ 18). Sanford's Director of Human Resources, Vice President of Human Resources, and Senior Director of Human Resources responded, noting their approval of the request, advising that "there is not a lot of tolerance for this type of behavior" and that termination for a physical altercation is "consistent with past similar situations." (Doc. 19, ¶ 19). The decision to terminate Hassan and Wallenberg's employment was a collaborative decision based upon input from Human Resources and the operational vice president and senior director of supply chain operations. (Doc. 19, ¶ 20).

Both Hassan and Wallenberg were terminated on March 19, 2018. (Doc. 19, ¶ 21). Their termination paperwork, signed by each respectively, stated that they were each terminated because of their involvement in a physical altercation with a co-worker in violation of Sanford's Disruptive Conduct and Behavior Policy. (Doc. 19, ¶ 24-28).

**B. Procedural History**

On or around March 5, 2019, Hassan filed a Charge of Discrimination ("the Charge") with the Equal Employment Opportunity Commission alleging that Sanford failed to address reports he made about incidents of racism that he experienced during the course of his employment with Sanford. (Doc. 1). On July 26, 2019, Hassan filed a *pro se* complaint against Sanford. (Doc. 1). Hassan also filed a motion to proceed in forma pauperis. (Doc. 2).

The Court granted Hassan's motion to proceed in forma pauperis. The Court found that Hassan was financially eligible to proceed in forma pauperis under 28 U.S.C. § 1915(a). In screening Hassan's complaint under 28 U.S.C. § 1915(e)(2)(B), the Court concluded that Hassan had stated a claim for hostile work environment under Title VII of the Civil Rights Act.

During discovery, Hassan did not respond to Sanford's interrogatories. (Doc. 18, ¶ 5). On April 30, 2021, Sanford filed a Motion for Summary Judgment and accompanying statement of material facts. Hassan's response to Sanford's motion was due on May 21, 2021. To-date, no response by Hassan has been received by the Court. A jury trial in this matter is scheduled to begin on September 21, 2021. (Doc. 16).

## LEGAL STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet this burden, the moving party must identify those portions of the record which demonstrate the absence of a genuine issue of material fact, or must show that the nonmoving party has failed to present evidence to support an element of the nonmovant's case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th

Cir.2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, the dispute must be outcome determinative under prevailing law." *Id.* at 910-11 (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)). In ruling on a motion for summary judgment, the facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Rule 7.1.B. of the Civil Local Rules of Practice provides that "[o]n or before 21 calendar days after service of a motion and brief, unless otherwise specifically ordered by the court, all opposing parties must service and file a responsive brief containing opposing legal arguments and authorities in support thereof." Sanford's Motion for Summary Judgment was filed on April 30, 2021, (Doc. 17), and under Local Rule 7.1.B., Hassan's responsive brief was due on May 21, 2021. To-date, Hassan has not made any filings or communicated with the Court in any way. Accordingly, Sanford will be entitled to summary judgment if the facts presented in Sanford's statement of material facts and the inferences drawn from those facts, viewed in the light most favorable to Hassan, show that Sanford is entitled to judgment as a matter of law.

## DISCUSSION

Under Title VII of the Civil Rights Act of 1964, an "employer" is prohibited from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Racial discrimination that creates a hostile or abusive work environment is a violation of Title VII. *See Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 578 (8th Cir. 1999). A hostile work environment arises when racial discrimination has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. *See Vajdl v. Mesabi Academy of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir. 2007) (citation omitted). To establish a prima facie hostile work environment claim, a plaintiff must show: 1) that he belonged to a protected group; 2) that he was subjected to unwelcome harassment; 3) that the harassment was based on race; 4) that it affected a term, condition, or privilege of employment; and 5) that the employer knew or should have

known of the harassment and failed to take prompt and effective remedial action. *See Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 979 (8th Cir. 2003); *see also Gipson*, 171 F.3d at 578 (stating that the same standards are generally used to evaluate claims of hostile work environment based upon sexual harassment and racial harassment). "[S]ummary judgment should be granted in employment discrimination cases only if the evidence could not support any reasonable inference of discrimination." *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1055 (8th Cir. 2007).

Sanford concedes that Hassan, because of his race, is a member of a protected group and based on the record before it, the Court finds that prior to the physical altercation on May 15, 2018, he was subject to unwelcome harassment by Wallenberg. In February 2018, it appears that Wallenberg made a negative comment about Hassan's culture. (Docs. 18-2; 18-6). However, this incident was addressed by management. Lacy Jenkins with Sanford met with Wallenberg and Hassan and set expectations of the two of them working together and communicating professionally and respectfully about work. (Doc. 18-6). There is no other evidence in the record showing that Sanford either knew or should have known of any other comments made by Wallenberg on the basis of Hassan's race during the course of Hassan's employment with Sanford.

"To support a cause of action [for hostile work environment], conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment." *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir. 2003) (internal quotation and citation omitted). A plaintiff must show that the harassment was "so intimidating, offensive, or hostile that it poisoned the work environment." *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003). "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (internal citation and quotation omitted). Similarly, for racial harassment to be sufficiently severe or pervasive to create a hostile working environment "[m]ore than a few isolated incidents are required." *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 573 (8th Cir. 1997) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)).

Hassan was employed by Sanford Medical Center from May 16, 2012 until March 19, 2018, and the Court finds that a single incidence during this time of receiving derogatory remarks

regarding Hassan's culture is insufficient to establish a prima facie case for hostile work environment. In addition, the evidence shows that Sanford took remedial action after this incident.

In addition, the Court finds that there is no evidence that Hassan's termination was on the basis of his race. Although it is unclear who started the altercation on May 15, 2019, both parties and witnesses agree that the Hassan and Wallenberg were shoving and pushing each other and were grappling, with at least one party ending up on the floor. Hassan and Wallenberg had to be separated by a fellow co-worker. Sanford interviewed the two witnesses to the incident on the day of the incident and interviewed Hassan and Wallenberg the next day. Both Hassan and Wallenberg were suspended and then terminated. The email correspondence among management at Sanford indicates that termination was on account of the physical altercation and Hassan and Wallenberg's termination paperwork, signed by each of them, indicated that they were terminated for violating Sanford's policy on Disruptive and Inappropriate Behaviors. The Court finds that based on the evidence in the record, no reasonable juror could conclude that discrimination was a motivating factor in Hassan's termination. *See Griffith v. City of Des Moines*, 387 F.3d 733, 735 (8th Cir. 2004) ("At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was a motivating factor in the defendant's adverse employment action.").

Accordingly, it is hereby ORDERED that Sanford's Motion for Summary Judgment (Doc. 17) is GRANTED.

Dated this 14th day of June, 2021.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK